**ALTHEIMER & GRAY, a partnership, Plaintiff–Appellant,**

v.

**SIOUX MANUFACTURING CORPORATION, Defendant–Appellee.**

No. 92–1633.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1992.

Decided Jan. 8, 1993.

As Amended Jan. 22, 1993.

---

Daniel S. Hefter (argued), Maureen A. Gorman, John R. Heine, Hefter & Radke, Chicago, IL, for plaintiff-appellant.

John Y.E. Lee, Donald V. Jernberg, Oppenheimer, Wolff & Donnelly, Chicago, IL, Robert Vaaler, Allen J. Flaten (argued) Vaaler, Warcup, Woutat, Zimney & Foster, Grand Forks, ND, for defendant-appellee.

Before POSNER and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

This case deals with the modern application of a 19th century federal statute designed to protect Indian tribes in land transactions. For reasons explained below, we reverse the district court's grant of summary judgment and remand the case for further proceedings.

## I. BACKGROUND

In 1872, Congress passed what is now known as 25 U.S.C. § 81. The statute requires contracts concerning Indian lands to be approved by the Secretary of the Interior. Contracts without the Secretary's approval are of no effect. According to the Supreme Court, the statute was "intended to protect the Indians from improvident and unconscionable contracts." *In re Sanborn*, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893); *see also Cong. Globe* 1483 (1871) (law is for Indians' "protection and to prevent them from being plundered"). At the time of the law's enactment, Indians apparently were being swindled by dishonest lawyers and claims agents. *See United States ex rel. Shakopee Mdewakanton Sioux Community v. Pan Am. Management Co.*, 616 F.Supp. 1200, 1217 (D.Minn.1985), *appeal dismissed*, 789 F.2d 632 (8th Cir.1986).

■ As this court noted in 1985, Congress has neither implicitly nor explicitly overruled section 81 and the statute continues to "govern[ ] transactions relative to Indian land for which Congress has not passed a specific statute." *Wisconsin Winnebago Business Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir.1985). The statute, in fact, has seen new life in recent years as Indian reservations have contract-

ed with outside firms to build and operate bingo halls and casinos on their reservations. *See id.*

The case before us also features 25 U.S.C. § 81 and an Indian tribe attempting to generate revenue for its people. Here, though, the tribe chose to reduce its forty-five percent unemployment rate through manufacturing rather than through gambling. To do so, the Devils Lake Sioux Tribe ("Tribe"), a federally recognized Indian tribe, created the Sioux Manufacturing Corporation ("SMC") to manufacture and market camouflage cloth and military helmets. SMC is a wholly-owned tribal corporation and governmental subdivision of the Sioux, organized under the Tribe's Law and Order Code. The corporation's offices and sole manufacturing facility are located inside the boundaries of the Devils Lake Sioux Reservation ("Reservation") in Fort Totten, North Dakota, on land which SMC leases from the Tribe. The Reservation itself was established by treaty on February 19, 1867.

Seeking to expand their business, the Tribe and SMC negotiated with Medical Supplies & Technology, Inc. ("MST"), an Illinois corporation, to manufacture and market latex medical products at the Reservation plant. In the course of these negotiations, MST submitted a "Letter of Intent" to "the Fort Totten Tribe of the Sioux Nation and Sioux Manufacturing Corporation ('Sioux'), to set forth its understanding of the terms of certain proposed transactions by and among MST ... and an entity wholly-owned, directly or indirectly, by the Sioux." On March 7, 1990, John Veleris, MST's president, and Robert Manning, vice-president and general manager of SMC, signed the nine-page Letter of Intent ("Letter").

According to the Letter, MST, the Tribe, and SMC would engage in a business to produce and market various latex medical products in facilities located on the Reservation. The parties intended that MST would "provide its technology, know-how and expertise in relation to the production and marketing of the Products" whereas SMC would obtain all required governmen-

tal approvals, including "any approvals required by the Bureau of Indian Affairs." SMC was also to provide "all working capital, investment capital, facilities and labor needed for the production of the Products and the operation of the Business."

The details of these transactions were to "be discussed further by Seller and Buyer and agreed to in good faith and shall be set forth in various contracts and other agreements." One of the agreements was to be an "Asset Purchase Agreement," whereby SMC would purchase all of MST's assets. These assets included contracts for machines that produce the latex products, architectural drawings for the facility, and waste and environmental plans for the Reservation land. Another future agreement was to be a "Consulting Agreement," whereby MST would provide consulting services to SMC for the management and operation of the latex products business. This would entail MST supplying technical and engineering assistance, marketing the products, and training those individuals that SMC picked for the management and operation of the business.

The Letter also outlined various payments from SMC ("Buyer") to MST ("Seller") for its consulting services and provided that MST would take up to thirty percent of the latex business's "net profits." The net profit was to be calculated as the difference between gross sales of the latex medical products and:

(a) cost of materials; (b) wages (in an amount mutually agreeable to Buyer and Seller); (c) utilities and maintenance; (d) salaries and administration (in an amount mutually agreeable to Buyer and Seller); (e) costs paid to Veleris for consulting under the Consulting Agreement; (f) rent; (g) taxes (it being understood, however, that the amount of taxes imposed by tribal authorities to be deducted from Net Profits will not exceed 1% of gross sales); (h) other operational costs (to be agreed to by Buyer and Seller); (i) $83,-334 per year; and (j) the Applicable Percentage of depreciation of equipment calculated on a straight line basis over 30 years.

As can be seen above, under the contemplated agreements neither SMC nor MST would be able to unilaterally set salaries or wages or administration costs or other operational costs.

Anticipating future lawsuits, the Letter contained a section entitled "Sovereign Immunity." This section provided that "Buyer and the Fort Totten Tribe of the Sioux Nation (the 'Tribe') will waive all sovereign immunity in regards to all contractual disputes." The section also said that "This agreement and all agreements contemplated hereunder will be executed and interpreted in accordance with the laws of the State of Illinois" and that all parties "agree to submit to the venue and jurisdiction of the federal and state courts located in the State of Illinois."

The closing of "the transactions contemplated" by the Letter was to be within sixty days of "acceptance of this Letter of Intent." In the interim, the parties were to fulfill various conditions relating to such topics as financing and distribution. Although neither party was required, by terms of the Letter, to enter into any future agreement until those conditions had been met, "all parties are hereby bound in good faith to attempt to fulfill all such conditions."

At the end of the Letter comes section 13, upon which this lawsuit is based. Under the title of "Expenses," section 13 outlined a scheme whereby each party would pay its own expenses if "the transactions contemplated herein are consummated." If, however, the transactions were not consummated within the sixty-day period "or if the Sioux at any time notifies any other party that they are terminating negotiations" then "the Sioux shall promptly pay, upon demand, all reasonable legal and accounting fees and expenses" incurred by MST in connection with the negotiation of the deal. The Tribe and SMC were relieved from payment, however, if "actions taken in bad faith by Seller" prevented the consummation. In such a case, MST would pay "all reasonable fees and expenses incurred by Buyer."

After the Letter of Intent was signed on March 7, 1990, MST began business operations within the SMC manufacturing facilities. The closing, however, did not occur within the sixty-day period and the parties executed two subsequent agreements to extend the date of closing until November 1, 1990. Despite the extensions, none of the contemplated contracts were ever executed, the deal was never consummated, and MST ceased operations within the Reservation.

## II. PROCEDURE

In Spring 1991, SMC was hit with a double-barreled attack. On May 10, 1991, MST sued SMC in Illinois state court for breach of contract. MST contended that SMC failed to act in good faith to satisfy the contractual conditions precedent to closing. On June 5, 1991, MST's law firm, Altheimer & Gray, filed suit against SMC in federal district court. Altheimer is a partnership organized under Illinois law with its principal place of business in Chicago, Illinois; it has 82 partners, all of whom are citizens of Illinois or Indiana. The firm had provided MST with legal services in connection with the negotiations with SMC and in its suit contended it was an intended third-party beneficiary of section 13 of the Letter of Intent agreement. Altheimer sought payment of $167,593.77 in damages plus interest and costs.

On June 12, 1991, SMC removed MST's action to district court, and on SMC's motion the district court consolidated the two cases. The district court based its subject matter jurisdiction on the diverse citizenship of the parties, pursuant to 28 U.S.C. § 1332. On August 20, 1991, SMC filed a motion to dismiss or, in the alternative, for summary judgment. On November 15, 1991, the district court granted summary judgment to SMC on the ground that the contract was null and void under 25 U.S.C. § 81. On November 29, 1991, Altheimer filed a motion to vacate the judgment pursuant to Federal Rule of Civil Procedure 59(e). On February 14, 1992, the district court entered an order denying that motion. MST did not appeal; Altheimer did, filing its initial Notice of Appeal on March

12, 1992. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

 In reviewing a district court's grant of summary judgment, we review de novo the record and the controlling law. *Appley v. West,* 929 F.2d 1176, 1179 (7th Cir.1991). We will uphold the entry of summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## IV. ANALYSIS

On appeal, the Plaintiff presents these four arguments: 1) the Letter of Intent is not relative to Indian lands, and therefore does not fall within 25 U.S.C. § 81; 2) SMC's obligations under the Letter do not adversely affect any tribal land interest; 3) any ambiguity in the agreement's obligations relative to Indian lands establishes a genuine issue of material fact which precludes summary judgment; and 4) the obligations of the Letter are severable from the contemplated contracts.

The Defendant responds with these three arguments: 1) the Letter of Intent is relative to Indian lands, and as it does not comply with 25 U.S.C. § 81 the agreement is null and void; 2) as a sovereign, the Sioux are immune from suit; and 3) Altheimer failed to exhaust tribal court remedies and therefore federal court consideration of the case is premature.

As can be seen, the principal dispute between the parties concerns the application of 25 U.S.C. § 81 to the Letter of Intent. It is there that we will begin our analysis.

## A. RELATIVE TO INDIAN LANDS

In pertinent part, section 81 reads:

No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands ...

unless such contract or agreement be executed and approved as follows:

. . . . .

Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.

. . . . .

All contracts or agreements made in violation of this section shall be null and void....

25 U.S.C. § 81.

The language of the statute mandates a three-part inquiry into the identity of the contracting parties, the nature of the contract, and whether the contract was approved by the Secretary of Interior. The last inquiry is the easiest to dispose of, as both parties admit the contract formed by the Letter of Intent was never approved by the Secretary. Our inquiry, therefore, focuses on these two issues: 1) was the disputed contract "with any tribe of Indians," and 2) is the contract "for the payment or delivery of any money or other thing of value ... or for the granting or procuring any privilege ... in consideration of services for said Indians relative to their lands"?

### 1. The Contracting Parties

Although the Letter of Intent was signed by the president of Medical Supplies & Technologies, Inc. and the vice-president of Sioux Manufacturing Corporation, the court below considered the contract to be between the Sioux Tribe and MST. The court did not lightly ignore SMC's corporate status, but recognized that both plaintiff and defendant seemingly considered the Tribe and SMC to be interchangeable.

MST, advised by Altheimer, addressed the Letter of Intent to the "Fort Totten Tribe, Sioux Nation." MST also referred to both the Tribe and SMC collectively as the "Sioux," and listed the "Sioux" as participants in several of the contemplated transactions. Section 13, for instance, states that "if the Sioux at any time notifies any other party that they are terminating negotiations ... the Sioux shall

promptly pay, upon demand, all reasonable legal and accounting fees." MST, moreover, seemed to regard the signature of Sioux Manufacturing as binding upon the Tribe itself regarding the waiver of sovereign immunity, choice of law, and forum selection clauses.

Nor does the Defendant in this case consistently distinguish the two entities. In its brief, SMC argues the corporation should be treated as the Tribe and notes the following facts: SMC is located on twenty-seven acres of land held in trust for the Tribe by the United States; under its articles of incorporation, SMC is chartered as "a tribal corporation and government subdivision" of the Tribe; as a governmental subdivision, SMC enjoys federal and tribal law with all privileges and immunities of the Tribe; SMC's board of directors must include the six sitting members of the Sioux Tribal Council.

■ Given this alleged unity between SMC and the Tribe, Defendant contends section 81 should apply to the corporation. To support its position, SMC cites *Pueblo of Santa Ana v. Hodel,* 663 F.Supp. 1300 (D.D.C.1987). In that case, the Pueblo created the Santa Ana Enterprise ("Enterprise") to generate revenue for the tribe. The Enterprise was a nonprofit instrumentality of the Pueblo of Santa Ana; it was empowered to make contracts, to sue and be sued, but it had no power to bind or obligate the funds of the Pueblo. The Enterprise was not a corporation, did not hold itself out as a corporate entity, and had no shareholders. The tribe leased 100 acres of tribal trust land to the Enterprise and gave it full power to develop and manage the property. The Enterprise in turn contracted with a non-Indian businessman to construct, manage, and maintain a greyhound racetrack on the tribal land. By terms of the contract, neither the Enterprise nor the businessman could encumber the property without the consent of the other. *Id.* at 1302–03.

After the Secretary of Interior refused to approve the facility, banks supporting the racetrack withdrew their funding. This prompted the Pueblo to sue the Secre-

tary. In their suit, the tribe argued that the Secretary's approval was not required since section 81 applies only to agreements between non-Indians and Indian tribes, and the contract was with Santa Ana Enterprise and not the tribe. The district court rejected this argument. According to the court, allowing the Pueblo to evade section 81 through the formation of the Enterprise would undercut Congressional intent: "Congress could not have mandated that the Secretary review all leases and contracts between Indian and non-Indian only to permit the tribes to avoid review when they deem provident." *Id.* at 1306.

The court below accepted the analogy to *Pueblo of Santa Ana.* Altheimer, however, argues that SMC's status as a business corporation is "more than a mere formality" and contends the contract is with the corporation and not the Tribe. To support this contention, Altheimer cites *Inecon Agricorp. v. Tribal Farms, Inc.,* 656 F.2d 498 (9th Cir.1981). In that case, the Fort Mojave Indian Tribe created Tribal Farms, an Arizona corporation. The corporation contracted with Inecon, a non-Indian corporation, for agricultural land development and management. After a dispute between the two parties, an arbitrator ruled in Inecon's favor and awarded substantial damages. In a three-page opinion that contained little elaboration or analysis of the disputed contracts, the Ninth Circuit said the contracts were not covered by 25 U.S.C. § 81.

Crucial to the Ninth Circuit's decision was that the contract was with a corporation, rather than the tribe itself: "Tribal Farms is an Arizona corporation and thus does not fall within the protected class of 'tribe of Indians or individual Indians' covered by the statute." 656 F.2d at 501. Altheimer points out that SMC, unlike the Enterprise in *Pueblo of Santa Ana,* is a corporation with funds and property that are separate and distinct from the Tribe. This, it argues, places the present dispute closer to *Inecon.* We disagree.

Plaintiff ignores the facts of *Inecon.* In *Inecon,* the Ninth Circuit described the Indian tribe has having a "limited role" in the

contract. *Inecon*, 656 F.2d at 498. According to the Ninth Circuit, the Fort Mojave Indian Tribe's "sole interest in the contract is its pledge 'not to interfere, hinder, or otherwise obstruct Inecon, its officers, agents or employees in its performance of its contract duties or receipt of its contract rights.' " *Id.* at 501. The Sioux cannot be said to have played such a limited role in the present contract.

We wish to make clear that we do not regard SMC as a "mere formality," but we also do not regard our task as authoritatively delineating the powers of tribal corporations. Nor do we rule on whether a contract with an Indian corporation differs significantly from a contract with an Indian tribe. Instead, we simply agree with the court below that in analyzing the applicability of section 81 the contract should be viewed as being between an Indian tribe and MST. That being the case, the next step is to analyze the contract to see if it relates to Indian lands.

### 2. Relation to Indian Land

■ The next question in our inquiry is whether the contract is "for the payment or delivery of any money or other thing of value . . . or for the granting or procuring any privilege . . . in consideration of services for said Indians relative to their lands"? The district court assumed the Letter of Intent was a valid contract and concluded that the agreement was relative to Indian lands.

Perhaps the determinative factor in the court's decision was the Letter of Intent's first page, which stated that "Seller and Buyer will produce and market various latex medical products . . . in facilities located on the Sioux Reservation located in Fort Totten, North Dakota." The court rejected Altheimer's contention that since SMC leased the land from the Tribe, the contract was outside section 81: "Regardless how one characterizes its present use, the land remains tribal land." *Altheimer & Gray v. Sioux Mfg. Corp.*, Nos. 91 C 3496 & 91 C 3653, 1991 WL 261332, at *6, 1991 U.S.Dist. LEXIS 16,799, at **16 (N.D.Ill. Nov. 14, 1991), *amended*, 1992 WL 46479, 1992

U.S.Dist. LEXIS 1680 (N.D.Ill. Feb. 13, 1992).

This conclusion was further reinforced by the court's determination that the Tribe and SMC were virtually indistinguishable. "The letter of intent," wrote the court, "relates to a business venture between an Indian and a non-Indian organization to be located on tribal land and thus required the approval of the Secretary of Interior." *Id.* 1991 WL 261332, at *7, 1991 U.S.Dist. LEXIS 16,799, at **22. As there was no approval, the court held the letter to be null and void and granted summary judgment to SMC.

We are responsible, in part, for the district court's decision. Looking for guidance on 25 U.S.C. § 81, the court turned to the leading Seventh Circuit opinion on this statute, *Wisconsin Winnebago Business Committee v. Koberstein*, 762 F.2d 613 (7th Cir.1985). The district court interpreted *Koberstein* as standing for the proposition that the phrase "relative to Indian lands" must be "liberally interpreted to effectuate its purpose of protecting Indian interests," and that this court interprets section 81 as covering "nearly all transactions relating to Indian lands." *Altheimer*, 1991 WL 261332, at *5, 1991 U.S.Dist. LEXIS 16,799, at **14.

The district court's interpretation of *Koberstein* is not incorrect. As that case held, once a contract is found to relate to Indian lands, section 81 continues to operate. The district court, however, was too liberal in its interpretation of when a contract actually does relate to Indian lands.

In *Koberstein* this court was faced with the validity of a bingo management agreement between the Wisconsin Winnebago Tribe and the non-Indian Ho–Chunk Management Corporation. Under the agreement, Ho–Chunk would construct a bingo hall on tribal trust land. Thereafter, Ho–Chunk had the exclusive right to operate and maintain the hall. The tribe, on the other hand, was forbidden by the contract from encumbering the property without Ho–Chunk's consent. The tribe also could not modify, cancel, or assign the contract. In return for Ho–Chunk's services, it was to receive twenty-five percent of net oper-

ating profits. *Koberstein*, 762 F.2d at 614–15.

This court held that such an agreement was relative to Indian lands and therefore subject to section 81's requirements. Crucial to the court's holding were the facts that: 1) the non-Indian party had an absolute right to control the business's operation; 2) the business was located on tribal trust lands; and 3) the contract prohibited the exercise of the tribe's right to encumber tribal trust property. *Id.* at 619.

*Koberstein* is not alone in considering these facts important. In *A.K. Management Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785 (9th Cir.1986), the Ninth Circuit also found a bingo hall management agreement to be related to the Indian land because it gave a "non-Indian contracting party ... the exclusive right to build and control the operation of the bingo facility located on tribal trust lands and prohibits the Band from encumbering the land." *Id.* at 787.

A year after *A.K. Management*, the Ninth Circuit found a contract relative to Indian land even though the contract did not contain a clause forbidding the Indians to encumber their land. In *Barona Group of Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc.*, 840 F.2d 1394 (9th Cir.1987), *cert. dismissed*, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988), the court held that the contract was nonetheless relative to tribal land in that the non-Indian party had the exclusive right to construct and operate the bingo facility on Indian land. *Id.* at 1404. The Ninth Circuit reasoned that neither *A.K. Management* nor *Koberstein* required both exclusive control and an encumbrance clause as the *"sine qua non"* to finding a contract relative to Indian lands. *Id.*

In *United States Shakopee Mdewakanton Sioux Community v. Pan American Management Co.*, 616 F.Supp. 1200 (D.Minn.1985), *appeal dismissed*, 789 F.2d 632 (8th Cir.1986), the court also went beyond these two factors in finding a contract relative to Indian land. In considering a contract for the construction of a bingo facility, the court noted that unless the bingo hall was located on tribal land, the hall could not legally operate: "The very existence of the bingo operations arises from the Indian tribe's sovereignty over tribal trust lands which makes state gaming laws inapplicable to games on reservations.... But for its land, state law would not permit it." 616 F.Supp. at 1218. This persuaded the court that the management agreement was "inextricably tied up in the property rights" and fell under section 81's requirements. *Id.*

Reviewing the relevant cases, it is clear that the following factors are important in determining whether a management contract is relative to Indian lands: 1) Does the contract relate to the management of a facility to be located on Indian lands? 2) If so, does the non-Indian party have the exclusive right to operate that facility? 3) Are the Indians forbidden from encumbering the property? 4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign? To quote the Ninth Circuit, none of the above factors are the *"sine qua non"* of a contract which relates to Indian lands. A review of the questions above, however, will show why we believe this contract is not related to Indian lands.

First, the Letter of Intent admittedly envisioned that the latex glove manufacturing operation would be located on the Sioux Reservation. Unlike the bingo hall cases, however, the facility was already in existence, was part of the Tribe's ongoing business, and was wholly owned by the Tribe. Second, neither the Letter nor the contracts contemplated by the Letter would give MST exclusive control over SMC's production of latex medical products. As earlier outlined, MST would be heavily involved in the venture. MST would sell manufacturing contracts and technical plans to SMC, MST would consult on every facet of the business's operation, including the production and marketing, and MST would receive a substantial share of the business's profits. MST, however, did not have unilateral power to set wages and salaries or operation and administration costs. While it

may be an understatement to characterize MST solely as a consultant, it would be an overstatement to say MST had exclusive control over the SMC facility.

Third, neither party disputes that there was no provision forbidding the Indians from encumbering their land, either under the Letter of Intent or the contemplated contracts. Finally, the business derived no special benefit from its location on Reservation land. Unlike bingo, manufacturers of latex medical products need not seek refuge from state civil laws by locating on a reservation. As Plaintiff notes, SMC was not obligated to perform on Indian lands. In short, the Tribe did not cede any right, interest or control of Indian lands to MST.

These factors, among others, lead us to hold that neither the Letter of Intent nor the contemplated contract relate to Indian lands, and therefore the agreement is not subject to section 81. Given our position, it is unnecessary to address the additional arguments that Plaintiff advances. We thus are left to consider Defendant's arguments concerning sovereign immunity and tribal exhaustion.

## B. SOVEREIGN IMMUNITY

■ Indian tribes are considered "domestic dependent nations" which "exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991). "Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Id.; accord Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940).

■ As a wholly-owned governmental subdivision of the Tribe, SMC contends it enjoys the Tribe's sovereign immunity. SMC points to sections 2–2–103 and 10–4–106 of the Sioux's Tribal Law and Order Code ("Code") which reserve sovereign status and immunity for tribal entities. While SMC admits the Tribe may waive its sovereign immunity, SMC contends there was no waiver in this case since SMC and not the Tribe itself signed the Letter of Intent. We find this argument unpersuasive.

The Tribe itself, by passing section 10–4–106(1) of the Code, provides that sovereign immunity may be limited by a tribal entity's charter. SMC's charter does just that, providing that sovereign immunity "is hereby expressly waived with respect to any written contract entered into by the Corporation." SMC Charter § 4.2.2. On similar facts, several courts have considered a tribal corporation's sovereign immunity waived by a written contract. *See Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 671 (8th Cir.1986); *Snowbird Constr. Co. v. United States*, 666 F.Supp. 1437, 1441 (D.Idaho 1987); *Namekagon Dev. Co. v. Bois Forte Reservation Hous. Auth.*, 395 F.Supp. 23, 28 (D.Minn.1974), *aff'd*, 517 F.2d 508 (8th Cir.1975).

Even if we did not consider the foregoing a clear waiver of any sovereign immunity SMC may enjoy, we find the Letter of Intent itself forecloses argument on this point. As we mentioned at the outset, the Letter of Intent contains a provision specifically dealing with sovereign immunity. Under that section, SMC and the Tribe agreed to "waive all sovereign immunity in regards to all contractual disputes." Assuming the Letter is a valid contract, we agree with the court below and conclude the Tribe and SMC have waived sovereign immunity.

## C. TRIBAL EXHAUSTION

■ The last issue to be dealt with is whether or not the doctrine of "tribal exhaustion" bars this lawsuit. The doctrine requires litigants, in some instances, to exhaust their remedies in tribal courts before seeking redress in federal courts. The leading cases on tribal exhaustion are *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and it is to these cases that we now turn.

In *National Farmers Union* a Crow Indian minor was hit by a motorcycle in the parking lot of a school located within the Crow Indian Reservation, but on land owned by the State of Montana. Through his guardian, the boy sued the school district in the Crow Tribal Court and the court awarded default damages to the boy. After being notified of the award, the school district and its insurer, National Farmers Union, alleged the existence of a federal question and sought injunctive relief in federal district court. The district court granted the insurance company and school district a permanent injunction against any execution of the tribal court judgment. The Supreme Court found the district court's action premature.

In the Court's opinion, the tribal court should have had "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction. 471 U.S. at 856, 105 S.Ct. at 2454. This meant that the petitioners should "have exhausted the remedies available to them in the Tribal Court system" before a federal court considered "any relief." *Id.* at 857, 105 S.Ct. at 2454. This rule, felt the Court, would further Congress's policy of "supporting tribal self-government and self-determination." *Id.* at 856, 105 S.Ct. at 2454. The Court remanded the case to the district court to determine whether the federal action should be dismissed or stayed pending exhaustion of tribal court remedies. *Id.* at 857, 105 S.Ct. at 2454.

Two years later, in *Iowa Mutual,* the Court addressed the question of "whether a federal court may exercise diversity jurisdiction before the tribal court system has an opportunity to determine its own jurisdiction." 480 U.S. at 11, 107 S.Ct. at 974. The case started when a member of the Blackfeet Indian Tribe filed a complaint in the Blackfeet Tribal Court against his employer and his employer's non-Indian insurance company. The employer was a Montana corporation which was owned by members of the Blackfeet Tribe and operated a ranch on the tribe's reservation.

While the employee's suit was pending in tribal court, the insurance company filed an action in federal district court against the employee and employer alleging it had no duty to defend or indemnify. The district court dismissed the suit for lack of subject-matter jurisdiction, holding that the tribal court should be given the opportunity to determine the tribal court's jurisdiction. The Supreme Court felt dismissal may not have been necessary. As with the doctrine of abstention, the doctrine of tribal exhaustion does not deprive a district court of subject-matter jurisdiction. Exhaustion, the Court explained, is "not a jurisdictional prerequisite," but rather is "a matter of comity." *Id.* at 16 n. 8, 107 S.Ct. at 976 n. 8. In addition to dismissing a case, therefore, a district court also has the choice of staying the action pending further tribal court proceedings.

The latter course was the Court's preference in *Iowa Mutual.* The Court felt that the tribal appellate court should have been given the opportunity to review the determination of the lower tribal court: "Until appellate review is complete, the Blackfeet Tribal Courts have not had a full opportunity to evaluate the claim and federal courts should not intervene." *Id.* at 17, 107 S.Ct. at 977. The exhaustion doctrine was to apply regardless of whether the case involved diversity or a federal question. *Id.* at 16, 107 S.Ct. at 976.

The Court's decision in this case was motivated by: 1) the federal policy of encouraging tribal self-government; 2) the view that tribal courts "play a vital role in tribal self-government," *Id.* at 14–15, 107 S.Ct. at 975; and 3) the recognition that "A federal court's exercise of jurisdiction over matters relating to reservation affairs can ... impair the authority of tribal courts." *Id.* at 15, 107 S.Ct. at 976. Regarding the scope of a tribal court's jurisdiction, the Court wrote, "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Id.* at 18, 107 S.Ct. at 977.

It is unclear as to how broadly *Iowa Mutual* and *National Farmers* should be read. On one hand, the two Supreme Court cases dealt only with the situation where a tribal court's jurisdiction over a dispute has been challenged by a later-filed action in federal court. On the other hand, the policies underlying the two cases seem broader than this narrow context. Several appellate courts, consequently, have applied the tribal exhaustion rule to cases in which there existed no first-filed tribal court action. *See, e.g., Brown v. Washoe Hous. Auth.,* 835 F.2d 1327 (10th Cir.1988); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.,* 797 F.2d 668 (8th Cir.1986). Indeed, the Ninth Circuit has suggested that the exhaustion rule applies mandatorily to all cases relating to tribal or reservation affairs. *See, e.g., Burlington Northern R.R. v. Crow Tribal Council,* 940 F.2d 1239 (9th Cir.1991).

■■■ The court below correctly noted, however, that even Circuits favoring a broad reading of the tribal exhaustion rule find it necessary to examine the factual circumstances of each case. This must be done in order to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine. The Ninth Circuit case of *Burlington Northern* is an example of this individualized examination. In that case the Crow Tribe passed an ordinance establishing a tribal commission to regulate railroads crossing their reservation. The only affected railroad obtained a declaratory judgment in federal court that invalidated the ordinance. The appellate court vacated this judgment, ruling that the railroad was required to exhaust Crow tribal remedies before the district court could take action on the complaint.

Central to the court's holding was its view of the ordinance as being integral to the tribe's self-government and self-determination. The court saw the ordinance both as an assertion of the tribe's sovereign authority and as an instrument of exercising authority over services vital to the tribe's economic development. The court viewed the tribe's economic indepen-dence as the "foundation of self-determination." 940 F.2d at 1245. "Thus arises the necessity for ... exhaustion of tribal remedies: the Crow Tribe must itself interpret its own ordinance and define its own jurisdiction." *Id.* at 1246. *See also Weeks Construction,* 797 F.2d at 673 (contract dispute "arose on the reservation and raises questions of tribal law interpretation within the province of the tribal court").

In the present dispute, the district court found this case to be "a poor candidate for a precedent-setting application of the tribal exhaustion rule." *Altheimer & Gray v. Sioux Mfg. Corp.,* Nos. 91 C 3496 & 91 C 3653, 1991 WL 261332, at *5, 1991 U.S.Dist. Lexis 16,799, at **9 (N.D.Ill. Nov. 14, 1991), *amended,* 1992 WL 46479, 1992 U.S.Dist. Lexis 1680 (N.D.Ill. Feb. 13, 1992). As the court observed, the principal dispute between the parties concerns the application of a federal statute, 25 U.S.C. § 81, to the Letter of Intent. The other issues in this litigation concern a contract that both parties agreed would be interpreted under Illinois law. To apply the tribal exhaustion rule would place before the tribal court a dispute that must be resolved by laws of distant jurisdictions. *Cf. Myrick v. Devils Lake Sioux Mfg. Corp.,* 718 F.Supp. 753 (D.N.D.1989) (dismissal not necessary where federal issues predominate).

■■■ The interpretation of another jurisdiction's laws, however, does not alone foreclose application of the tribal exhaustion rule. A tribal court, presumably, is as competent to interpret federal law as it is state law. *See Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978 (alleged incompetence of tribal courts not an exception to exhaustion requirement). The tribal court's potential task of interpreting unfamiliar law, however, does show the dissimilarity of the present case as compared with *National Farmers* and *Iowa Mutual.* Here, there has been no direct attack on a tribal court's jurisdiction, there is no case pending in tribal court, and the dispute does not concern a tribal ordinance as much as it does state and federal law.

More importantly, we believe the application of the tribal exhaustion rule would not

serve the policies articulated in *Iowa Mutual* and *National Farmers*. As discussed above, the Supreme Court was concerned with implementing Congress's policy of tribal self-government. The Court feared that "unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs." *Iowa Mutual*, 480 U.S. at 16, 107 S.Ct. at 976. *See generally Duro v. Reina*, 495 U.S. 676, 692, 110 S.Ct. 2053, 2063, 109 L.Ed.2d 693 (1990) (history of modern tribal courts indicate they embody only powers of internal self-governance).

In this case, however, the tribal entity wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum. In the Letter of Intent, Sioux Manufacturing Corporation explicitly agreed to submit to the venue and jurisdiction of federal and state courts located in Illinois. To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination. The Tribe created SMC to enhance employment opportunities on the reservation. As the Ninth Circuit recognized, economic independence is the foundation of a tribe's self-determination. If contracting parties cannot trust the validity of choice of law and venue provisions, SMC may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught. We therefore affirm the district court's denial of SMC's motion for a stay of proceedings based on the tribal exhaustion rule.

## V. CONCLUSION

The judgment of the district court granting summary judgment in SMC's favor is reversed. We remand for proceedings consistent with this opinion. Each party shall bear its own costs.

REVERSED AND REMANDED.