**UNITED STATES of America,
Plaintiff,**

**v.**

**Collette BRADFORD, Defendant.**

**No. 03–CR–101–B.**

United States District Court,
D. Wyoming.

Nov. 12, 2003.

Darrell L. Fun, Assistant U.S. Attorney, Cheyenne, for Plaintiff.

Barry V. Voss, Voss and Hickman, Attorneys at Law, Minneapolis, MN, Daniel G. Blythe, Attorney at Law, Cheyenne, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MOTION IN LIMINE

BRIMMER, District Judge.

This case arises from a traffic stop and subsequent vehicle search resulting in the discovery of a large quantity of cocaine. The matter is before the Court on Defendant's Motion to Suppress Evidence and Motion in Limine. After reading the parties' submissions and hearing oral argument, being fully advised in the premises, and in accordance with its oral findings and rulings from the bench, the Court **FINDS** and **ORDERS** as follows:

### *Background*

On March 15, 2003, at 4:44 p.m., Defendant was stopped and detained by Trooper Ben Peech of the Wyoming Highway Patrol on I–80 eastbound, near mile marker 396. Defendant was driving a gold Chevrolet Malibu. Trooper Peech told Defendant, the only occupant of the vehicle, that she was following too closely, failing to use a turn signal, cutting in front of a semitruck without using a signal, and driving inattentively. Trooper Peech then asked Defendant for the vehicle's paperwork and Defendant's driver's license (which identified her as "Collette Elizabeth Bradford"). Defendant told Trooper Peech that the car was rented and began retrieving her driving documents.

Trooper Peech noticed that Defendant was very nervous. She was breathing rapidly and intensely, and her face was pale white. She cupped her hands in front of her chest and clutched them to her body. She was shaking and sweating, and her eyes were opened very wide. Trooper Peech also noticed that Defendant had a new-looking duffle bag on the rear seat, a pillow in a bag on the back seat, and a large number of fast food wrappers and potato chip bags behind the driver's seat and on the passenger's seat floor. Trooper Peech also saw a cellular phone. Based on the sum of these things, Trooper Peech became suspicious that Defendant was running drugs.

As Defendant handed Trooper Peech the rental agreement, her hands were visibly shaking. As she retrieved her license from her wallet, she fumbled with it and had to use both hands to give it to Trooper Peech. Her legs were also shaking. Her level of nervousness did not dissipate, and beads of sweat began to form at the neckline of her shirt.

Trooper Peech asked Defendant to come to his patrol car while he issued a warning citation and conducted a routine check of her status. While he waited for her to follow, he reviewed the rental agreement and noticed that the car had been rented at the Los Angeles airport on March 13, 2003 at 3:59 p.m. and was to be returned to the Minneapolis/St. Paul airport on March 17, 2003. He also noticed that it was a one-way rental for $104 per day. This increased his suspicions.

When Defendant came to the patrol car, Trooper Peech noticed that her hands and palms were glowing with sweat. When Trooper Peech commented, Defendant denied sweating and continually rubbed her hands together in an attempt to wipe away the sweat. While Peach issued the warning citations, he conversed with Defendant about her travels. Defendant said she was returning home to Minnesota from a family reunion in California. When asked how long the reunion was, Defendant responded, in a weak and high pitched voice, that it was about one week. When asked where the reunion was held, Defendant said it was outside Los Angeles, since her grandmother was originally from there.

Trooper Peech called dispatch to conduct a routine check of Defendant's driving status. Defendant's nervousness seemed to dissipate. Defendant told Trooper

Peech that she had flown to Los Angeles and rented the car to drive her grandmother to Cheyenne, Wyoming. When asked how her grandmother got to California, Defendant responded that her sister and parents had driven to California and picked up her grandmother on the way. When Trooper Peech asked how Defendant's parents and sister got back to Minnesota, Defendant stated that they all had flown back.

When Trooper Peech asked Defendant where in Cheyenne her grandmother lived, Defendant paused and hesitated for a noticeable length of time before answering. Her signs of nervousness returned. She was unable to say where her grandmother lived, only that she had directions to her house. When Trooper Peech asked if she lived in North or South Cheyenne, Defendant did not answer.

At that time, Trooper Peech stopped the conversation with Defendant while he observed a vehicle coming up from behind him. The vehicle appeared to be traveling about ninety miles per hour, and it rapidly moved from the left lane to the right lane, the same lane where Trooper Peech and Defendant were parked on the shoulder. Trooper Peech saw that the vehicle was approximately a quarter of a mile away, and it drifted across the fog line to the right. Trooper Peech was afraid that the vehicle would crash into the rear of his patrol car, and suspected that this vehicle could potentially have been a "chase" car often used by drug traffickers to ensure that the drugs reach their destination.

When Trooper Peech returned Defendant's documents and gave her the warning, he asked her if she had anything in the vehicle that he needed to know about. When she said that she did not, her signs of nervousness intensified. She clasped her driving documents close to her chest. When Trooper Peech asked about guns, bombs, or drugs in the car, Defendant swallowed hard several times before saying "no." Trooper Peech asked if he could look in the trunk, and Defendant replied, "Um...I don't feel it's necessary, but thank you," while laughing nervously. Trooper Peech again asked her if she had anything he needed to know about in the vehicle, and Defendant responded that she preferred that he did not look. Trooper Peech then told Defendant, "You have a safe trip, okay." Defendant exited the patrol car and began to walk toward her rental car, and Trooper Peech noticed that she had calmed down considerably and appeared normal.

Trooper Peech then reinitiated contact with Defendant in front of the patrol car. He asked her if it was okay to ask a few more questions. She responded, "Sure." Trooper Peech asked, "You sure?" Defendant replied, "Yeah." Defendant stated that she had dropped her grandmother off in Cheyenne. When asked her grandmother's name, Defendant repeated the question, paused, and with a squeaky voice, said, "Her name is . . . [pause and nervous laugh] . . . Elizabeth Bradford." When asked about her grandmother's phone number or area code, Defendant could not answer. She said that her grandmother had lived in Cheyenne for about one year. Defendant said that her grandmother moved to Cheyenne because it was too crowded in California. She also said that she had no other relatives in Cheyenne, and that her family reunion was held at a town outside Los Angeles. However, when asked the name of the town, Defendant could not remember. She also stated that she flew to Los Angeles, rented the car, and then drove from there. She said that she stayed with her aunt before going to the reunion.

Throughout the conversation, Defendant's responses were evasive, and she repeated questions as if stalling for time to

think, paused for an unusual length of time before responding, and laughed nervously while responding. Other signs of nervousness also returned, and she appeared even more nervous than before. Trooper Peech noticed splotchiness on Defendant's skin.

Defendant then told Trooper Peech that she wished to leave. Trooper Peech asked if he could search the car before she left, and Defendant's eyes began to water as if she were about to cry. Trooper Peech asked if she would be willing to wait for a K–9 unit, and Defendant stated that she wanted to leave. Trooper Peech then told Defendant that he would be temporarily detaining her while he called for a K–9 unit. Defendant asked why, and Trooper Peech explained that he believed she was lying about the details of her trip and that he suspected she had drugs in her car.

Trooper Peech immediately called for a K–9 unit at 4:52 p.m. Defendant waited near her rental car, and Trooper Peech was in his patrol car. Less than a minute later, Defendant came to the patrol car's passenger side door and opened it. She told Trooper Peech that she had a marijuana pipe in her car. Trooper Peech then called the K–9 unit to inform him that he did not need to respond. Trooper Peech exited his patrol car and asked Defendant if she had anything else. She replied that there was also a small bag of marijuana in the car. Trooper Peech told Defendant that if she was being honest and there was no other contraband in the car, he would issue a citation for possession of marijuana and release her. It appeared as if Defendant's demeanor relaxed.

Defendant walked to her vehicle and opened the passenger side door. She retrieved from her car and handed to Trooper Peech a blue colored pipe with residue consistent with burnt marijuana. She also gave Trooper Peech a small bag containing a green leafy substance consistent with marijuana. Defendant stated that her cousin had purchased the marijuana for her in Los Angeles, but that she had not smoked any while driving. Trooper Peech said that he needed to check the car to make sure she didn't have any more marijuana. Defendant immediately became nervous again. Trooper Peech instructed her to step away from the car and wait by his car. Trooper Peech then retrieved the car keys from the ignition and opened the trunk. He saw a brown colored suitcase, a plastic bag, and a newer duffle bag. Trooper Peech could hear Defendant saying, "Oh my God, no." When Trooper Peech opened the duffle bag, he found three packages the size of bricks or footballs wrapped in Saran Wrap that smelled like Orange Glo. He also noticed that there was a milky colored fluid in the bottom of the duffle bag. Trooper Peech recognized the packaging and cover scent as being consistent with methods drug traffickers use. He also recognized that the packages contained substances consistent with drugs. He then informed Defendant that she was under arrest.

Trooper Peech advised Defendant of her rights. Defendant told Trooper Peech that she was trying to pay for college, and it had been hard to resist the money offered to her to transport cocaine. She admitted that her grandmother did not live in Cheyenne and that she had not gone to a family reunion. She also stated, "I'm a horrible liar," and admitted that she was nervous while lying. She told Trooper Peech that the car should be moved off the road, as another vehicle was traveling with her. The rental car was searched, and, in addition to cocaine, a black plastic box and an envelope with $1,213 cash were found. The cocaine weighed about 18 pounds and 5 ounces (approximately 8,306.55 grams), and a portion field-tested presumptively positive for cocaine. The marijuana Defendant provided weighed approximately one gram.

## Legal Standards

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protections of the Fourth Amendment are applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655–56, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ According to the Supreme Court, "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (citations omitted). Traffic stops are characterized as investigative detentions; thus, the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), apply to them. *United States v. West,* 219 F.3d 1171, 1176 (10th Cir.2000). Therefore, in assessing the reasonableness of a stop, a court asks two questions: first, "whether the officer's action was justified at its inception"; and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868.

### I. Whether the Officer's Action Was Justified at Its Inception.

■ The officer's action is justified at its inception when "the officer has either (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir.1999) (internal quotation marks and citation omitted).

### II. Whether the Officer's Action Was Reasonably Related in Scope to the Circumstances Which Justified the Interference in the First Place.

■ "Reasonableness ... depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Holt,* 264 F.3d 1215, 1220 (10th Cir.2001). Courts are to view the officer's conduct through a filter of "common sense and ordinary human experience." *United States v. Mendez,* 118 F.3d 1426, 1431 (10th Cir.1997).

■ Thus, a justified traffic stop does not permit an officer to exceed the scope of the traffic-related purpose of the stop. *See Knowles v. Iowa,* 525 U.S. 113, 118–19, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). "Motorists ordinarily expect to be allowed to continue on their way once the purposes of a stop are met." *Holt,* 264 F.3d at 1221 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). "The Fourth Amendment reasonableness of a traffic stop ... must be judged by examining both the length of the detention and the manner in which it is carried out." *Id.* at 1230.

### III. Exceptions Allowing Officer to Exceed the Scope of the Traffic–Related Purpose of the Stop.

■ Once the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring"; or (2) "the initial detention has become a consensual encounter." *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) (citations omitted). If neither exception applies, but an officer detains a person to ask him questions unrelated to the traffic

infraction, then the detention is not related in scope to the circumstances that justified the interference in the first place. Therefore, it is an unreasonable seizure in violation of the Fourth Amendment. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991).

### A. Objectively Reasonable and Articulable Suspicion.

■ As to the first exception, whether there is a reasonable and articulable suspicion to detain a person, the Tenth Circuit defers to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir.1996). In making reasonable suspicion determinations, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274, 122 S.Ct. 744 (internal citation omitted).

### B. Consensual Encounter.

■ As to the second exception, "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *West*, 219 F.3d at 1176 (citation omitted).

### IV. *Exclusionary Rule.*

■ Under the exclusionary rule, when Government agents violate the Fourth Amendment in a search or seizure, the evidence obtained must be suppressed in the trial. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Moreover, the Government is prohibited from introducing evidence derived from, or built upon, the evidence unlawfully obtained. *See id.* at 484–85, 83 S.Ct. 407 (holding that the exclusionary rule applies to indirect as well as direct products of the illegal search). "Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence." *Id.* at 486, 83 S.Ct. 407.

### *Analysis*

Defendant concedes that Trooper Peech's initial action in stopping Defendant was justified at its inception as a result of the traffic violations he observed. However, Defendant denies that Trooper Peech had consent or reasonable suspicion to justify the detention and questioning of Defendant after the termination of the traffic stop, and further denies that Trooper Peech had probable cause to search the vehicle after Defendant gave him the marijuana bag and pipe.

■ The Court finds that Trooper Peech had reasonable suspicion, based on the totality of the circumstances, to detain Defendant for further questioning after the initial traffic stop was completed when he returned Defendant's driving documents to her. In addition, he also had consent, as he asked her twice whether it was okay for him to ask her more questions, and she replied affirmatively both times. There is no indication that Trooper Peech made any overbearing show of authority to obtain her consent.

The Court also finds that Trooper Peech had reasonable suspicion when he told Defendant that he would have to detain her until a K–9 unit could arrive. The sum of the factors that Trooper Peech witnessed

both during the initial traffic stop and during the subsequent questioning was more than enough to give a law enforcement officer reasonable suspicion that illegal activity was afoot. Defendant's numerous physical manifestations of fright, including perspiration, hard breathing, shaking, wringing of hands, and splotchiness; her evasive and conflicting responses that defied common sense, coupled with nervous laughter and a squeaky voice; her inability to answer some questions that should have been easy to answer if she were telling the truth; the items that Trooper Peech saw in the vehicle; the one-way rental from Los Angeles to Minneapolis at $104 per day; and the passing vehicle's bold exhibition of typical "chase car" behavior—all of these things amounted to a totality of circumstances which, had they not made Trooper Peech highly suspicious, would have revealed him to possess less competence than the citizens of Wyoming would expect in one of their law enforcement officers. They certainly gave him a "particularized and objective basis" for suspecting legal wrongdoing.

█ Furthermore, when, less than a minute after Trooper Peech told Defendant that he would be detaining her until a K–9 unit could arrive, Defendant promptly admitted to possessing a marijuana pipe and a bag of marijuana, Trooper Peech had probable cause to search Defendant's vehicle for other contraband. Not only was it reasonable to suspect, but it was probable, that Defendant was voluntarily confessing to possession of a small amount of marijuana in order to avoid being caught and punished for a much larger amount of cocaine. *See United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir.1998) (holding that "probable cause to search a vehicle is established if, under the 'totality of the circumstances,' there is a 'fair prob-

ability' that the car contains contraband or evidence").

Because Trooper Peech had probable cause to believe that the vehicle contained contraband, he was justified in searching it without a warrant. *See United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (holding that a warrantless search of a vehicle is reasonable if the officer has probable cause to believe it contains contraband); *United States v. Arzaga*, 9 F.3d 91, 94 (10th Cir.1993) (stating that "[w]e have upheld the warrantless search of a vehicle where events preceding the search gave the officer probable cause to believe the [vehicle] contained illegal drugs"). Indeed, it would have been a dereliction of Trooper Peech's duty had he simply cited her for possession of the contraband and went along his way without investigating further.

### Conclusion

The Court finds that Trooper Peech was entirely justified and acted appropriately at every stage of the incident in question: the traffic stop, the questioning and detention of Defendant, and the search of Defendant's vehicle. Trooper Peech did not violate Defendant's Fourth Amendment rights or any other constitutional rights. Accordingly, Defendant's Motion to Suppress Evidence and Motion in Limine are **DENIED.**