**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

COLLETTE ELIZABETH
BRADFORD,

Defendant-Appellant.

No. 04-8039

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(District Court No. 03-CR-101-B)**

Barry V. Voss, of Barry V. Voss, P.A., Minneapolis, Minnesota, for Defendant-Appellant Collette Elizabeth Bradford.

David A. Kubichek, Assistant United States Attorney for the District of Wyoming (Matthew H. Mead, United States Attorney for the District of Wyoming, with him on the brief), for Plaintiff-Appellee United States of America.

Before **SEYMOUR** , **McWILLIAMS** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

Defendant-Appellant Collette Elizabeth Bradford was indicted on one count of possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). Following the district court's denial of her pre-trial motion to suppress, she pleaded guilty with the condition that she could appeal the suppression ruling. We now consider her appeal of that ruling and the application of the Supreme Court's recent decisions in *United States v. Booker*, 125 S. Ct. 738 (2005), and *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm Ms. Bradford's conviction and the district court's denial of her motion to suppress, vacate her sentence, and remand for resentencing.

## I. BACKGROUND

The district court found the following facts, which are undisputed. *See United States v. Bradford*, 290 F. Supp. 2d 1264 (D. Wyo. 2003). On March 15, 2003, Trooper Ben Peech of the Wyoming Highway Patrol observed a gold Chevrolet Malibu traveling eastbound on Interstate 80 in Laramie County, Wyoming. He pulled the Malibu over for following a semi-truck too closely and for failing to indicate lane changes. He asked the driver, Ms. Bradford, to show him the vehicle's paperwork and her driver's license. Ms. Bradford told Trooper Peech the car was rented and retrieved her driving documents.

2

Trooper Peech noticed that Ms. Bradford was very nervous. She was breathing rapidly and intensely, and her face was pale white. She cupped her hands in front of her chest and clutched them to her body. She was shaking and sweating, and her eyes were opened very wide. Trooper Peech also observed that she had a new-looking duffle bag on the rear seat, a pillow was in a bag on the back seat, and a large number of fast food wrappers and potato chip bags were scattered throughout the car. He also saw a cellular phone. Based on the sum of these observations, Trooper Peech became suspicious that she was running drugs.

When Ms. Bradford handed Trooper Peech the rental agreement, her hands were visibly shaking and she fumbled her license as she retrieved it from her wallet. She used both hands to give it to Trooper Peech. Her legs were also shaking. Her level of nervousness did not dissipate, and beads of sweat began to form at the neckline of her shirt.

Trooper Peech asked Ms. Bradford to sit in his patrol car while he issued her a warning citation and conducted a routine check of her status. While he waited for her to follow him to the patrol car, he reviewed the rental agreement and noticed the car had been rented at the Los Angeles airport on March 13, 2003 and was to be returned to the Minneapolis/St. Paul airport on March 17, 2003. He also noticed it was a one-way rental for $104 per day. This increased his suspicions, based on his training that one-way rental agreements are a "large flag

3

of criminal interdiction." Aplt's App. at 17.

When Ms. Bradford came to the patrol car, Trooper Peech noticed her hands and palms were glowing with sweat. When Trooper Peech commented on that, Ms. Bradford denied sweating and began rubbing her hands together continually in an attempt to wipe away the sweat. While Trooper Peech issued the citation, he conversed with Ms. Bradford about her travels. She said she was returning home to Minnesota from a family reunion in California. When he asked her how long the reunion was, she responded in a weak and high-pitched voice that it lasted about one week. He asked her where the reunion was held, and she said it was outside of Los Angeles because her grandmother was from there.

Trooper Peech called dispatch to conduct a routine check of Ms. Bradford's driving status, and her nervousness finally seemed to dissipate. She told Trooper Peech that she had flown to Los Angeles and rented the car to drive her grandmother to Cheyenne, Wyoming. When he asked how her grandmother got to California, Ms. Bradford responded that her sister and parents had driven to California and picked up her grandmother on the way. Trooper Peech asked how they got back to Minnesota, and Ms. Bradford stated that they had flown back.

Trooper Peech then asked Ms. Bradford where her grandmother lived in Cheyenne. Ms. Bradford paused and hesitated for a noticeable length of time before answering and her signs of nervousness returned. She was unable to say

4

where her grandmother lived, only that she had directions to the house. When Trooper Peech asked if her grandmother lived in North or South Cheyenne, Ms. Bradford did not answer. At that moment, Trooper Peech stopped talking to Ms. Bradford because he observed a vehicle approaching them at about ninety miles per hour, moving rapidly from the left lane to the right lane. Trooper Peech and Ms. Bradford were sitting in the patrol car parked on the right shoulder. He saw that the vehicle was approximately a quarter of a mile away, drifting across the fog line to the right. Trooper Peech became concerned that the vehicle would crash into the rear of his patrol car. He suspected the vehicle was a "chase" car, often used by drug traffickers to ensure drugs reach their final destinations.

Trooper Peech did not follow the other car. He returned Ms. Bradford's documents and gave her a warning. He also asked her if she had anything in the vehicle he needed to know about. She said she did not. Her signs of nervousness intensified as she clasped her driving documents close to her chest. He asked whether there were guns, bombs, or drugs in the car, and Ms. Bradford swallowed hard several times before saying "no." When he asked if he could look in the trunk, and Ms. Bradford replied, "Um . . . I don't feel it's necessary, but thank you," while laughing nervously. Trooper Peech again asked if she had anything he needed to know about in the vehicle, and she told him she would prefer for him not to look. Trooper Peech told Ms. Bradford "you have a safe trip, okay."

5

Ms. Bradford exited the patrol car and began to walk toward her rental car. Trooper Peech reinitiated contact with Ms. Bradford between their cars. He asked her if it was okay to ask a few more questions. She said "sure." Trooper Peech then asked, "are you sure?" and she replied, "yeah."

Trooper Peech asked Ms. Bradford what her grandmother's name was. She repeated the question, paused, and with a squeaky voice, said her grandmother's name was Elizabeth Bradford. Trooper Peech then asked Ms. Bradford about her grandmother's phone number or area code, and she could not answer. She said her grandmother had moved to Cheyenne because California was too crowded and had lived there for about a year. She also said that she had no other relatives in Cheyenne and the family reunion was held at a town outside Los Angeles. When Trooper Peech asked the name of the town, she could not remember. She also stated that she flew to Los Angeles, rented the car, and drove from there. Trooper Peech observed that her responses were evasive, she repeated questions as if stalling for time to think, she paused for an unusual length of time before responding, and she laughed nervously while responding. Other signs of nervousness also returned, including profuse sweating and splotchiness on her skin.

Ms. Bradford then told Trooper Peech she wished to leave. He asked if he could search the car before she left, and her eyes began to water as if she were about to cry. Trooper Peech asked if she would be willing to wait for a K-9 unit,

6

and she again stated she wanted to leave. Trooper Peech told her he would be temporarily detaining her while he called for a K-9 unit. She asked why, and Trooper Peech explained that he believed she was lying about the details of her trip and suspected she had drugs in her car.

Trooper Peech called for a K-9 unit. Ms. Bradford waited near her rental car, and Trooper Peech was in his patrol car. Less than a minute later, she came to the patrol car's passenger side door and opened it. She told Trooper Peech that she had a marijuana pipe in her car. Trooper Peech then called the K-9 unit to instruct it not to respond. Trooper Peech exited his patrol car and asked Ms. Bradford if she had anything else. She replied that there was also a small bag of marijuana in the car. Trooper Peech told her that if she was being honest and there was no other contraband in the car, he would issue a citation for possession of marijuana and release her. Ms. Bradford relaxed.

She walked to her vehicle and retrieved a blue colored pipe with residue consistent with burnt marijuana. She also gave Trooper Peech a small bag containing a green leafy substance consistent with marijuana. She stated that her cousin had purchased the marijuana for her in Los Angeles, but that she had not smoked any while driving. Trooper Peech said he needed to check the car to make sure she did not have any more marijuana. She immediately became nervous again. Trooper Peech instructed her to step away from the car and wait

7

by his car. Trooper Peech then retrieved the car keys from the ignition and opened the trunk. He saw a brown colored suitcase, a plastic bag, and a newer duffle bag. Trooper Peech heard Ms. Bradford say "oh my God, no." When Trooper Peech opened the duffle bag, he found three packages, each the size of a football, wrapped in Saran Wrap that smelled like Orange Glo cleaning product. He also noticed that there was a milky colored fluid in the bottom of the duffle bag. Trooper Peech recognized the packaging and cover scent as methods used by drug traffickers. He also recognized that the packages contained substances consistent with drugs.

Trooper Peech informed Ms. Bradford she was under arrest and advised her of her rights. She told Trooper Peech she was trying to pay for college, and it had been hard to resist the money she was offered to transport cocaine. She admitted that her grandmother did not live in Cheyenne and that she had not gone to a family reunion. She also stated that she was a "horrible liar," and admitted that she became nervous when she was lying. She told Trooper Peech that the car should be moved off the road, as another vehicle was traveling with her. The State Crime Lab later determined that the cocaine from the duffle bag weighed 4.97 kilograms.

Ms. Bradford filed a pretrial motion to suppress the cocaine, arguing it was the fruit of an illegal search. After conducting a suppression hearing, the district

8

court denied her motion. *See Bradford*, 290 F. Supp. 2d at 1271. Ms. Bradford subsequently entered a conditional guilty plea.

The district court calculated Ms. Bradford's total offense level at thirty-one and her criminal history in category I. The court found Ms. Bradford responsible for five kilograms of cocaine, thirty grams more than the 4.97 kilograms to which she pled guilty of possession. Five kilograms of cocaine yields a base offense level of thirty-two. The court imposed a two-level enhancement for obstruction of justice because Ms. Bradford absconded from supervision after offering assistance to the government, as well as a three-level reduction for acceptance of responsibility because she pleaded guilty. Ultimately, the court sentenced Ms. Bradford to 132 months of incarceration, within the range of 120-135 months authorized by the United States Sentencing Guidelines Manual.

## II.   DISCUSSION

Ms. Bradford contends Trooper Peech lacked both reasonable suspicion to detain her and probable cause to search the car and trunk. She also claims an obstruction of justice enhancement imposed by the district court because she absconded from a Minneapolis hotel room while under arrest constituted a *Blakely/Booker* violation. Finally, she alleges error under *Blakely/Booker* because the court sentenced her based on five kilograms of cocaine even though she pled

guilty to possessing only 4.97 kilograms. The court's determination was based on evidence that she made nine prior paid trips from California to Minnesota; the court thought it "highly unlikely that such trips would not have involved more than 30 grams of drugs." Sent. Tr. at 43. We will address each contention in turn.

## A.    The Search and Seizure

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. CONST. amend. IV. In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997). The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo. *Id.* (citations omitted). We view the evidence in the light most favorable to the district court's determination. *Id.* (citations omitted).

### 1.    Validity of the Seizure

A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). We have held that a routine traffic stop is more analogous to an investigative detention than a

custodial arrest. *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). "We therefore analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)." *See id.* To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

### a. Validity of the Initial Stop

Ms. Bradford conceded before the district court that Trooper Peech's "initial action in stopping [her] was justified at its inception as a result of the traffic violations he observed." *Bradford*, 290 F. Supp. 2d at 1270. Even if she had not conceded this issue, there is no question that Trooper Peech's observations of her "following too closely, failing to use a turn signal, cutting in front of a semi-truck without using a signal, and driving inattentively," *id.* at 1266, justified him pulling her over, because "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

### b. Scope of the Questioning

Ms. Bradford argues Trooper Peech's actions were not reasonably related in scope to the stop because of his "detailed questioning" while she was seated in

11

the patrol car and his further questioning after he gave her back her paperwork. *See* Aplt. Br. at 14. Neither contention has merit.

While Trooper Peech was issuing the citation and running a computer check of Ms. Bradford's records, he chatted with her about the nature of her trip. It is well-established that "[a] law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997). Moreover, we have held that during the stop, an officer may ask routine questions about the driver's travel plans. *See United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). Clearly, this was a routine traffic stop and Trooper Peech did not exceed its scope by asking about Ms. Bradford's travel plans.

After the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter. *See United States v. Cervine*, 347 F.3d 865, 868-69 (10th Cir. 2003). The questioning here was valid under both rationales.

12

### i. Reasonable, Articulable Suspicion

When determining whether reasonable suspicion exists, we look to the "totality of the circumstances" to see whether the officer had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2000) (further quotation omitted). It is important to note that many aspects of Ms. Bradford's behavior, standing alone, would be insufficient to establish reasonable, articulable suspicion. Some items motorists might possess must be "outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous," *Wood*, 106 F.3d at 946, including cellular telephones. *Williams*, 271 F.3d at 1269. Likewise, wrappers from fast food establishments strewn about a car may indicate slovenliness or the need to travel while eating, but do not by themselves indicate a driver smuggling contraband. *See United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998) ("We also conclude that the mere presence of fast-food wrappers in the Buick is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity."); *Wood*, 106 F.3d at 947 (holding suspicion associated with possession of fast-food trash "is virtually nonexistent"); *United States v. Karnes*, 62 F.3d 485, 496 (3d Cir. 1995) (noting fast food wrappers "have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the

13

innocent traveler"). The mere fact that a rental car was procured in California does not make its driver a drug dealer. *See Beck*, 140 F.3d at 1132 ("We do not think that the entire state of California, the most populous state in the union, can properly be deemed a source of illegal narcotics such that mere residency in that state constitutes a factor supporting reasonable suspicion."). Moreover, we have repeatedly emphasized that nervousness and its signs should not be overcounted in our analysis. *Compare United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (holding nervousness is "of limited significance" in determining whether reasonable suspicion exists) *with United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000) (noting extreme and continued nervousness "is entitled to somewhat more weight") *and Williams*, 271 F.3d at 1269 (concluding that when nervousness exceeds that of the average citizen during a traffic stop, there is "no reason . . . to ignore [a defendant's] nervousness in reviewing the totality of the circumstances.").

Nevertheless, even if each factor confronting Trooper Peech may have had an innocent explanation when standing alone, the totality of the circumstances compels the conclusion that Trooper Peech had a particularized and objective basis for suspecting legal wrongdoing. As the district court noted, in addition to the cellular telephone, the luggage in the backseat, and the fast-food wrappers, Ms. Bradford exhibited numerous physical manifestations of fright, including

14

perspiration, hard breathing, shaking, wringing of hands, splotchiness, nervous laughter, and a squeaky voice. *Bradford*, 290 F. Supp. 2d at 1271. Her answers to basic questions were evasive and conflicting at best, and the story she told defied common sense, particularly the financial illogic of purchasing a series of one-way plane tickets and one-way car-rentals. She could not answer simple questions about where her grandmother lived in Cheyenne. She could not explain the timing discrepancies of her story, including her claim that she picked up the rental car at Los Angeles International Airport prior to a week-long family reunion even though the car's rental agreement reflected that it had been picked up only two days earlier. Finally, the passing vehicle displayed bold "chase car" behavior. We are confident in our conclusion that reasonable, articulable suspicion existed.

### ii. Consensual Encounter

If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs. *See United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997). A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. *See West*, 219 F.3d at 1176. "A consensual

15

encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *Id.* (internal quotation marks omitted). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* (internal quotation marks omitted). An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave. *Id.* An unlawful detention occurs only when the driver has an "objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *Id.* (internal quotation marks omitted).

After Trooper Peech issued Ms. Bradford the warning and gave her documents back, he asked if there was anything in the car he needed to know about. *See Bradford*, 290 F. Supp. 2d at 1267. We follow "the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to [her]." *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *overruled on other grounds by Botero-Ospina*, 71 F.3d at 787. The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. *United States v. Elliott*, 107 F.3d 810, 813-14 (10th Cir. 1997). A routine traffic stop becomes a consensual encounter once the trooper has returned

16

the driver's documentation so long as "'a reasonable person under the circumstances would believe [she] was free to leave or disregard the officer's request for information.'" *Id.* at 814 (quoting *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir.1993)).

The fact that Ms. Bradford "was sitting in . . . [Trooper Peech's] patrol car, without more, does not make her consent involuntary." *United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000); *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997) (finding an encounter to be consensual, despite the fact that the officer and the defendant were both sitting in the patrol car during the questioning, because a reasonable person would have felt free to terminate the encounter). Even so, Ms. Bradford, seated in the rear of a trooper's vehicle, after having been stopped for a perfectly legitimate reason, would not necessarily view herself as free to exit the vehicle if Trooper Peech continued with a stream of questions. *See United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994) ("No one who is seated in a law enforcement officer's vehicle after having been stopped by the officer for a perfectly legitimate reason, and who then asks whether the stop is at an end ('That's it?') and is immediately told 'No' and to 'wait a minute,' can reasonably view himself or herself as free to leave the patrol car.").

Although we are troubled by the fact that Ms. Bradford was sitting in the

patrol car while Trooper Peech questioned her after handing back her documents, there is no indication here that Trooper Peech made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled," suggesting that the detention had not ended. *See United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). Ms. Bradford neither argues nor cites to the record for any evidence that Trooper Peech asking her if there "was anything in the car he should know about" and asking to look in the trunk after handing back her documents was a result of a coercive show of power. Thus, after Trooper Peech handed back the documents, the traffic stop was over, and they were engaged in a consensual encounter.

After this consensual encounter ended, Trooper Peech told Ms. Bradford to have a safe trip; she exited the patrol car and headed toward the rental car. *See Bradford*, 290 F. Supp. 2d at 1267. Trooper Peech reinitiated contact with Ms. Bradford in front of the patrol car and asked if he could ask her a few more questions. *See id.* She said yes, and he asked her if she was sure. *See id.* She said yes again. *See id.* Ms. Bradford admits that this formed the basis of a consensual encounter because "this questioning was consensual in nature." Aplt. Br. at 14-15. From this point until Trooper Peech detained Ms. Bradford to wait for the drug dog, the Fourth Amendment was not implicated. When a "driver

18

voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs." *Anderson*, 114 F.3d at 1064.

### 2. Validity of the Search

Under the automobile exception to the Fourth Amendment's warrant requirement, "police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam); *see United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (internal quotation marks and emphasis omitted).

Less than a minute after Trooper Peech told Ms. Bradford he would be detaining her until drug-sniffing dogs could arrive, she went over to his patrol car and admitted to him that she had a marijuana pipe and small bag of marijuana in the car. *See Bradford*, 290 F. Supp. 2d at 1271. A reasonable officer would think that a suspect might confess to a small amount of drugs in order to avoid an investigation which would reveal a much larger amount of drugs. Coupled with her nervousness and evasiveness, we conclude the totality of circumstances facing Trooper Peech gave rise to probable cause there would be contraband in the trunk.

19

Ms. Bradford argues the marijuana from the passenger compartment of the car did not justify Trooper Peech searching the trunk. We have rejected this argument before, on lesser evidence of contraband than existed here. Generally, suspects do not hand their drugs over to officers as Ms. Bradford did here, so officers need to rely on the smell of drugs or drug-sniffing dogs to establish the existence of drugs in the passenger compartment of a car. *See United States v. Rosborough*, 366 F.3d 1145, 1152-53 (10th Cir. 2004) (holding"a canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well"); *United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993) (concluding that the smell of burnt marijuana from the passenger compartment justified a search of the passenger compartment).

The odor of burnt marijuana in the passenger compartment of a vehicle does not, standing alone, establish probable cause to search the trunk of the vehicle. *Nielsen*, 9 F.3d at 1491. Rather, an officer obtains probable cause to search the trunk of a vehicle if he smells marijuana in the passenger compartment and finds corroborating evidence of contraband. *See United States v. Loucks*, 806 F.2d 208, 210-11 (10th Cir. 1986) (finding an officer had probable cause to search the trunk of the defendant's car when he smelled and found marijuana in the passenger compartment of the car); *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995) (ruling probable cause to search the trunk of a defendant's

20

car was established when an officer smelled burning marijuana in the car and discovered contraband on the defendant's person). Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband. *United States v. Ross*, 456 U.S. 798, 825 (1982); *Loucks*, 806 F.2d at 210-11.

Here, it was clear there was marijuana in the passenger compartment of the vehicle, so there was no need for the corroboration of the smell of marijuana or for a drug-sniffing dog. When Ms. Bradford gave Trooper Peech the bag of marijuana and pipe from the car, the actual existence of drugs was proven and no further corroboration was necessary. At that point, Trooper Peech had probable cause to search anywhere else in the car that contraband might be present, including the trunk. This is particularly true given Ms. Bradford's attempt to circumvent a K-9 inspection by confessing to the marijuana. Were we to conclude otherwise, we would create an perverse incentive for drug smugglers carrying large amounts of contraband to confess to small amounts of marijuana to avoid further inspection. Probable cause existed here.

**B.    Sentencing Issues**

Ms. Bradford raises two *Blakely/Booker* issues. First, she argues the district court erred by imposing the two-level obstruction of justice enhancement, because a jury did not determine, and she did not plead to, facts supporting the

district court's conclusion that she absconded from supervision after her arrest. Second, she contends the district court erred because a jury did not find, and she did not plead to, the amount of cocaine on which the district court based its sentence.

### 1. Enhancement for Obstruction of Justice

Ms. Bradford did not raise a *Blakely*/*Booker* objection at trial or sentencing, so we review for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 729 (10th Cir. 2005) (en banc); *cf. Booker*, 125 U.S. at 769 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test."). The plain error test is met only where there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993); *Gonzalez-Huerta*, 403 F.3d at 732. The burden to establish prejudice to substantial rights is on Ms. Bradford, because she failed to raise the issue below. *United States v. Vonn*, 535 U.S. 55, 63 (2002); *Olano*, 507 U.S. at 734-35; *United States v. Dazey*, 403 F.3d 1147, 1175 (10th Cir. 2005).

Plain error review applies even if the alleged error is of constitutional dimension. *See Johnson v. United States*, 520 U.S. 461, 466 (1997); *United States v. Magallanez*, 408 F.3d 672, 683 (10th Cir. 2005). However, the plain error test

22

is applied less rigorously in the context of alleged constitutional error than in the context of non-constitutional error. *See Dazey*, 403 F.3d at 1175.

With regard to the obstruction of justice enhancement, the first two prongs of the plain error test are met because the district court made the finding that Ms. Bradford obstructed justice by absconding from supervision in Minnesota after her arrest, a fact not found by a jury and one to which she did not plead guilty. *See Dazey*, 403 F.3d at 1174-75 (holding the first two plain error prongs met where a district court, applying the pre-*Booker* mandatory guidelines, relied on facts the judge found by a preponderance of the evidence to increase a sentence beyond the maximum authorized by the facts established by the jury's verdict).

Ms. Bradford cannot, however, satisfy the third prong of the plain error test because she cannot show that the constitutional error in this case affects her substantial rights. For an error to have affected substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734; *Dazey*, 403 F.3d at 1175.

To demonstrate that the mandatory application of the Guidelines to facts a judge found by the preponderance of the evidence affected her substantial rights, Ms. Bradford must show a "reasonable probability" that the defects in her sentencing altered the result of the proceedings. *See United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004) ("In cases where the burden of

23

demonstrating prejudice . . . is on the defendant seeking relief, we have invoked a standard . . . requiring the showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'") (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J., delivering the opinion of the Court)). Ms. Bradford could make this showing in at least two ways:

> First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected [her] substantial rights. . . . Second, a defendant may show that the district court's error affected [her] substantial rights by demonstrating a reasonable probability that, under the specific facts of [her] case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a) the district court judge would reasonably impose a sentence outside the Guidelines range.

*Dazey*, 403 F. 3d at 1175 (footnote omitted).

Having reviewed the evidence submitted at the sentencing hearing, *see id.*, we conclude there is no reason to think a jury would not have found the same material facts as the judge, nor any indication that the district court would have sentenced any differently had it analyzed the proper sentencing factors. *See United States v. Dowlin*, 408 F.3d 647, 670 (10th Cir. 2005) (holding it "highly unlikely that the factual findings of the district court affected [defendant's] substantial rights" where defendant failed to argue the jury would not have reached the same conclusion). Ms. Bradford has never suggested that she did not

24

abscond from supervision while under arrest in Minneapolis; to the contrary, she admitted during sentencing that she did abscond: "I'm sorry for what I did. I'm sorry for the fact that I ran, but I did not want to compromise myself or my family." Sent. Tr. at 47. We need not proceed to the final prong of plain-error review on this issue.

### 2. Enhancement for Drug Quantity

At the sentencing hearing, the district court heard testimony from Special Agent Len Propps from the Division of Criminal Investigation in Cheyenne. Agent Propps testified that Ms. Bradford waived her *Miranda* rights after her arrest and told him she had made nine previous trips from California to Minnesota. *See* Sent. Tr. at 20, 26-27. According to Agent Propps, Ms. Bradford said she was paid $10,000 for this trip and $100 per day plus expenses for the other nine trips. *Id.* at 26. Agent Propps testified that Ms. Bradford "never told [him] that she hauled cocaine nine separate times," *id.* at 27, but asserted that "[they] were talking about cocaine, no other drug . . . nothing brought up other than she had made nine trips and she had got paid a hundred dollars for those trips. . . . She was talking about somebody in California . . . who she said were big people . . . dealing a hundred kilos every couple weeks." *Id.* Agent Propps verified three of the nine trips. *Id.* at 33. Ms. Bradford did not testify.

Based on Agent Propps' testimony and the presentence report, the court

made the following findings:

> I find that the defendant, indeed, made nine additional trips from Minneapolis to the West Coast. As she had admitted, and I think that these were trips for the purposes of transporting drugs, and I think that it is highly unlikely that such trips would not have involved more than 30 grams of drugs. In fact, I'll–of cocaine, in fact, and that I think the probation officer was reasonable in his conclusion that there would have been relevant conduct that involved more than 5 kilograms of cocaine, so that I think the probation officer is correct in determining the initial offense level . . . of 32, initially . . . .

*Id.* at 43. Thus, despite the fact that Ms. Bradford pled to possession of only 4.97 kilograms of cocaine with intent to distribute, *see* Aplt's App. at 99, the court sentenced her based on five kilograms of cocaine. With a criminal history in category I, five kilograms of cocaine garnered Ms. Bradford an offense level of thirty-two prior to adjustments for obstruction of justice and acceptance of responsibility.

At the hearing, Ms. Bradford objected to the court's inclusion of the additional thirty grams to which she did not plead, but did not make a *Blakely*-type argument. Prior to *Blakely* and *Booker*, we would have analyzed Ms. Bradford's objection under the traditional guideline standards requiring us to uphold the district court's determination as long as it was not based on guesswork and was supported by some indicia of reliability. *See United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996) ("When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an

26

estimate to establish the defendant's guideline offense level, so long as the information relied upon has some basis of support in the facts of the particular case, and bears sufficient indicia of reliability.") (internal quotation marks omitted); *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994) (holding an estimate is proper as long as it has "some basis of support in the facts of the particular case" and is not guesswork) (internal quotation marks omitted)*; United States v. Garcia*, 994 F.2d 1499, 1508 (10th Cir. 1993) (same).

After *Blakely* and *Booker*, however, we analyze the determination of facts not only for support in the record, but for who determined the facts. If the judge made factual findings increasing the top of the guideline range, rather than the jury determining the facts or Ms. Bradford pleading to them, the sentence is unconstitutional. *See Booker*, 125 S. Ct. at 756. As with Ms. Bradford's obstruction of justice enhancement, we review for plain error the drug quantity issue, because Ms. Bradford did not raise a *Blakely/Booker* objection on this issue at trial or sentencing. *See Gonzalez-Huerta*, 403 F.3d at 729.

The first two prongs of the plain error test are met with regard to the drug quantity issue, because the district court made the finding that Ms. Bradford carried at least thirty grams of cocaine on one, some, or all of her previous nine trips. Unlike the majority of *Booker* plain error cases in this circuit, however, the government has conceded that the third and fourth prongs of plain error analysis

27

may be satisfied here:

> [S]hould this court decide that the Defendant's sentence was infected with a *Blakely* error that can be said to be 'clear and obvious,' then it is an error that prejudiced the Defendant because it increased her total offense level by two levels, and it may likewise be an error of sufficient consequence to satisfy the fourth plain error requirement, because the evidence in support of that decision, while plainly sufficient under the guideline's preponderance standard, was in no sense either overwhelming or uncontradicted.

Aple's Br. at 48. We commend the government on its forthright acknowledgment that the third and fourth prong may be satisfied.

Our own review comports with this result. The third prong is satisfied because but for the court's finding that Ms. Bradford carried the additional thirty grams of cocaine on a previous trip, the result of the sentencing proceeding would have been different. Ms. Bradford's total offense level would have been two levels lower, as it would have been based only on the 4.97 kilograms of cocaine to which she pled guilty of possession.

The standard for meeting the fourth prong of plain error review is "demanding," *Gonzalez-Huerta*, 403 F.3d at 737, but we have acknowledged that, "depend[ing] on the facts of the particular case," it can be met. *Id.* If the error is "particularly egregious," and our failure to notice it would result in a miscarriage of justice, we may notice the error. *See United States v. Gilkey*, 118 F.3d 702, 704 (10th Cir. 1997); *see also Olano*, 507 U.S. at 736. Although we have noted that "not necessarily . . . all constitutional *Booker* errors that affect substantial

28

rights also undermine the integrity, fairness, or public reputation of judicial proceedings," *Dazey*, 403 F.3d at 1179, we believe it is a sound exercise of our discretion to remand this case for resentencing despite Ms. Bradford's failure to assert *Blakely/Booker* error in the district court. She made "numerous objections" to the presentence report and objected strenuously to the factual basis on which the judge found the additional thirty grams of cocaine. *See* Sent. Tr. at 3, 5-9. Without the judge-found two-level enhancement based on the additional thirty grams, the top of the guideline range in which she would have been sentenced properly was 108 months. Although the new guideline range is advisory and not mandatory after *Booker*, the difference for Ms. Bradford would be at least twenty-four months of incarceration. In the unique circumstances of this case, this difference, coupled with the conceded lack of substantial evidence supporting the basis for the upward adjustment, is sufficient for us to notice the error and remand this case for resentencing in light of *Booker*. *See Dazey*, 403 F. 3d at 1179 (noticing plain error where defendant received a substantial enhancement on the basis of judge-found facts he contested at the sentencing hearing, and he demonstrated a reasonable likelihood that post-*Booker* the outcome might have been significantly different); *cf. Dowlin*, 408 F.3d at 671-72 (refusing to notice plain error where defendant pointed to nothing in the record casting doubt on the fairness of her sentence, did not object to the facts on which her sentence was

enhanced, did not identify mitigating evidence the district court failed to consider at sentencing which might justify a lower sentence, and the record contained ample evidence supporting the sentence imposed).

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM Ms. Bradford's conviction and the district court's denial of her motion to suppress, VACATE her sentence, and REMAND the matter for resentencing in light of *Booker*.  We recognize that the district court may impose a sentence lower than, higher than, or equal to the sentence it imposed previously, if such a sentence is reasonable within the constraints imposed by *Booker*.  *See Magallanez*, 408 F.3d at 685.

30