**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MIGUEL ANGEL NAJERA,

Defendant-Appellant.

No. 04-3240

(D. Kan.)

(D.C. No. 03-20194-02-CM)

**ORDER AND JUDGMENT** *

Before **BRISCOE** , **BALDOCK** , and **TYMKOVICH** , Circuit Judges.

Defendant Miguel Angel Najera was one of several defendants charged

with conspiracy to distribute marijuana.  After his motion to suppress was denied,

he pleaded guilty to one conspiracy count.  He now challenges on appeal two

aspects of the proceedings below: (1) the denial of his motion to suppress, and (2)

the decision to enhance his sentence by four levels under the United States

Sentencing Guidelines.  Because the police had probable cause to arrest him at the

scene of a controlled drug delivery, we affirm the denial of Najera's motion to

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

suppress. And because he waived his right to appeal the sentence, we also dismiss that portion of his appeal.

## I. BACKGROUND

Joseph Benfield, a contract trucker delivering a load from El Paso to Kansas City, contacted police when he suspected his cargo contained illegal drugs. Benfield was carrying ten pallets of bentonite, an inexpensive, powdered clay, at the request of a person who identified himself as "Dan." "Dan" had instructed Benfield to deliver the bentonite to a business called Concrete Solutions in Kansas City after hours. "Dan" gave Benfield a contact number that he could use to reach Concrete Solutions.

En route, Benfield received an unusual number of calls from "Dan," checking to see if everything was okay. He was leery of these calls because he had carried more valuable freight and had never had customers call to check on him like this. When he called the number "Dan" had given him for Concrete Solutions, Benfield heard an answering machine greeting recorded in Spanish.

He then received a call from someone who identified himself as "Bill Riley," who changed the delivery address. He told Benfield to take the bentonite to a Shell gas station. Riley would flash his lights when Benfield arrived, and Benfield was to follow him.

Suspicious about his load, Benfield contacted law enforcement officers from a truck stop in southeast Kansas. A trained drug dog alerted on a bag of bentonite, and officers were able to confirm that the load contained bags of marijuana by probing the bentonite, removing a portion of marijuana, and field testing it. Agents would later determine that the load included about 571 pounds of marijuana.

Deciding to complete the transaction, a Kansas Highway Patrol trooper took Benfield's place at the wheel to execute a controlled delivery. When he arrived at the gas station, the trooper saw a red pickup truck, which flashed its lights and led him to Meyers Turf Farm.

By this time, it was after 7:00 pm on a December night, and Myers Turf Farm was closed for business. The farm covered about 20 acres and had a few buildings, but most of it was open farm land in a low-traffic area near Kansas City. Fences surrounded some, but not all, of the grounds. The pickup led the semi onto the farm, then the two men in the pickup got out, found a forklift, and started unloading palates of bentonite into a nearby warehouse. The undercover driver stayed in the semi, and other state and federal agents hid in various locations around the farm.

Within about fifteen minutes, the two men had unloaded five palates from the truck, and law enforcement officers swept onto the farm. They detained the

-3-

two and moved them toward a mechanic's garage on the farm to be interviewed by Special Agent Craig Wurdeman. The driver of the red truck, who earlier had identified himself as "Bill Riley," admitted that his name was really Robert Crumby. The man with him was his brother-in-law Gary Houston. Crumby told Wurdeman they were unloading the bentonite for someone named "Victor or Hector," another employee of Myers Turf Farm who had asked him to unload the truck. He denied knowing the shipment contained marijuana. Crumby also disclosed that "Victor" identified another "compadre" as involved in the delivery and that this was the second time Crumby had unloaded an after-hours delivery for "Victor" and his "compadre."

Another ten or fifteen minutes after Crumby was arrested two unidentified cars drove in tandem onto the farm: a turquoise Pontiac followed by a white conversion van. The van was driven by Najera and carried two other passengers. The Pontiac was driven by Victor Garcia, who got out and walked toward Wurdeman. Crumby immediately identified him as the one who had asked him to unload the truck. The three in the van did not get out.

Suspecting the others were also involved in the drug deal, Wurdeman called officers to detain them as well. Officers ordered the three men to get out of the van, handcuffed them, then searched them and the van. The search of Najera produced the cell phone that Benfield had called earlier with the Spanish greeting.

-4-

Call logs showed numerous calls between Najera's phone and Crumby's phone.

Once the suspects had been detained, the officers took them to DEA headquarters for further questioning. At the station, Najera refused to answer any questions, but Garcia told officers that Najera was the "ring leader" of the marijuana conspiracy.

Crumby, Garcia, and Najera were indicted for conspiracy to possess marijuana with the intent to distribute. Najera moved to suppress the evidence seized during the search, arguing that the search and seizure violated the Fourth Amendment. The district court rejected this argument, finding the detention was initially supported by reasonable suspicion, and extension of that detention into a full arrest was supported by probable cause created by Garcia's incriminating statements.

Najera pled guilty to the offense and was sentenced on June 22, 2004. In calculating the offense level, the district court included 375 pounds of marijuana from the earlier, unindicted transaction at the same farm, which resulted in a guideline range of 87–108 months. The court imposed a low-end sentence of 87 months.

## II. ANALYSIS

On appeal, Najera challenges two aspects of the proceedings below. First, he renews his argument that the evidence should be suppressed because the search

and arrest lacked probable cause. Second, he claims his sentence was enhanced in violation of *United States v. Booker*, 543 U.S. 220 (2005). We reject both arguments.

*A. Motion to Suppress*

Najera argues that the officers violated the Fourth Amendment when they arrested him and searched his car. The government responds that the search was a proper search incident to arrest. Indeed, the Supreme Court has authorized evidentiary searches of individuals and (if they are in a vehicle at the time) their automobiles, incident to a lawful arrest. *See New York v. Belton*, 453 U.S. 454, 460 (1981) (upholding the search of passenger compartment of an automobile incident to a lawful arrest of someone in the vehicle); *Chimel v. California*, 395 U.S. 752, 763 (1969) (stating that police may search an arrestee for weapons or evidence). Thus, the only issue is whether the arrest was supported by probable cause. We conclude that it was.

When reviewing an order denying a motion to suppress, we review legal conclusions de novo and factual determinations for clear error. *See, e.g., United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). "The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo." *Id.*

We have noted that, "[t]o be lawful, a warrantless arrest must be supported by probable cause to arrest." *United States v. Edwards*, 242 F.3d 928, 933 (10th Cir. 2001) (citation omitted). "Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Guerrero-Hernandez*, 95 F.3d 983, 986 (10th Cir. 1996). Probable cause, however, is a "fluid concept" that "deals with probabilities" in light of the "totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

The central issue in this case is whether the totality of the circumstances pointed specifically to Najera or whether he was implicated by his mere presence at the scene of the crime. Indeed, we have recognized that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). "However, where there are facts in addition to one's association with someone engaged in [or some place associated with] criminal activity, . . . we must consider whether the 'totality of the circumstances' known at the time of the arrest established probable cause." *Id.* at 1216–17 (citing *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984) ("In order to find probable cause based on association with persons

engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown."), and *United States v. Ramirez*, 963 F.2d 693, 698–99 (5th Cir. 1992) (holding that police had probable cause to arrest defendant who was seen in the company of drug suspects, was seen meeting suspects while they engaged in a drug conspiracy, and whose behavior was consistent with the inference he was part of the conspiracy).

In this case, a number of facts beyond Najera's mere presence at the farm gave the police probable cause to believe that he was involved in the drug transaction. First, the officers knew that someone other than Crumby was involved in the transaction because Benfield had called a number associated with the conspiracy and reached a Spanish answering machine greeting. Crumby confirmed that other people were involved when he told Agent Wurdeman that he was unloading the truck for "Victor or Hector," who was coordinating things for his "compadre." Thus, when Garcia and Najera arrived together so promptly after Crumby started unloading the drugs, it was obvious they arrived in connection with the delivery. Crumby immediately confirmed that Garcia was the one who had asked him to unload the truck.

Other facts at the time of delivery also support a finding of probable cause. Although Crumby identified only Garcia by name, it was not unreasonable for the

officers to conclude that Najera and his passengers were also involved in the drug deal. It was evening in early December, and the turf farm was located in a remote part of town. The farm was closed for the day, so Najera could not have been there on legitimate business. [1] The two vehicles arrived together and parked in a way that suggested they were traveling as a pair. Crumby had told the officers that "Victor" was working on the drug deal with his "compadre."

Najera, nonetheless, argues that "showing up *after* a controlled delivery is mere coincidence until investigation shows otherwise." Appellant Br. at 16. While this may be true in circumstances where an individual has plausible business at a place where crime happens to be afoot, that is not the situation faced by the drug enforcement officers here. The business was closed and off the beaten path. The only reason for Najera's presence was in connection with the drug transaction, and nothing points to an innocent explanation or even coincidence. Moreover, but for the police interruption of Crumby's work, Garcia and Najera likely would have arrived to witness the delivery still in progress.

---

[1] Najera argues that the police did not actually know the farm was closed until after they had arrested Najera. The farm owner confirmed the farm was closed and that while Crumby often worked late, the others had no business being there. The timing of this conversation, however, is irrelevant. As a matter of fact, the farm was obviously closed, and the circumstances support the officers' inference that Garcia and Najera had no legitimate reason to be there. Moreover, the record reflects that Benfield had instructions to deliver the shipment after hours.

And, as we have noted, the fact that Najera traveled in tandem with Garcia, whom Crumby did identify, suggests he was involved in the drug deal. Unlike a passenger who might just have been "along for the ride," Najera was driving in a separate vehicle. It is highly unlikely that Garcia would have invited an innocent companion to follow him in a separate car while he checked on a drug delivery in process. [2]

Najera argues that his case is indistinguishable from United States Supreme Court precedent holding proximity to persons or places implicated in a crime does not establish probable cause. In *Ybarra v. Illinois*, 444 U.S. 85 (1979), the Supreme Court held that police lacked probable cause to search a bar patron who happened to be at the bar when a search warrant was executed. The court stated that "mere propinquity" to the suspect or the premises was insufficient to create probable cause to search Ybarra. *Id.* at 91. Unlike Ybarra, however, Najera was not merely present by virtue of his patronage of a legitimate business. As discussed above, the turf farm was closed and out of the way. The timing of his

_____

[2] In addition to these facts, we also note that after the individuals were taken to the police station, Garcia identified Najera as the ringleader in the drug conspiracy, confirming the belief that Najera was involved in the transaction. The district court relied on this identification to hold that the police had probable cause to arrest Najera, but we do not rely on that statement since it was not made at the turf farm.

arrival and his obvious connection to Garcia, who had been implicated in the conspiracy, distinguish this case from *Ybarra*.

Similarly, *United States v. Di Re*, 332 U.S. 581 (1948), is of little help to Najera. The Supreme Court in *Di Re* concluded that police lacked probable cause to arrest a passenger in the car where the confidential informant, who was driving, identified a second passenger, but not the first, in a criminal enterprise. Here, however, Crumby did not identify Garcia to the exclusion of other participants in the scheme. First, unlike the circumstances in *Di Re*, where a confidential informant had the incentive and obligation to incriminate everyone involved in the crime, Crumby would not be expected to identify Najera. In *Di Re*, the circumstances suggested an inference that the informant was identifying the *sole* member of the conspiracy. Crumby's identification bears no such implication. Crumby simply identified Garcia as his contact person and further implicated another individual as well. Unlike a confidential informant, who would have known many of the internal details of the conspiracy, Crumby denied knowing anything about the drugs and, by implication, who besides Garcia was in the distribution chain.

Moreover, Crumby told officers that someone besides Garcia was involved. Nothing suggests that Crumby was aware of or intended to reveal the entire scope of the conspiracy. To the contrary, his identification of "Victor's" associate only

as "compadre" suggests he did not know specifically who else might have been involved. Rather than limiting the scope of the conspiracy to Garcia, Crumby's statements make clear that others were involved.

In summary, numerous facts beyond casual or coincidental association tied Najera to the drug delivery. For these reasons, we hold that the police had probable cause to arrest Najera and the others based on the circumstances developed at the turf farm.

*B. Sentencing Enhancements*

In addition to appealing his motion to suppress, Najera challenges the district court's decision to enhance his sentence pursuant to the United States Sentencing Guidelines under *United States v. Booker*, 543 U.S. 220 (2005). The government relies primarily on *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004), in responding that Najera waived his right to appeal his sentence. Since the briefs were filed, we issued a decision in *United States v. Maldonado*, 410 F.3d 1231 (10th Cir. 2005), where we dismissed a *Booker* claim pursuant to an appeal waiver with language identical to the waiver in this case.[3] We see nothing

---

[3] Najera's plea agreement stated:

> Defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, conviction and sentence, except the defendant is allowed to appeal the Court's denial of his motion to suppress evidence seized based upon the

(continued...)

to distinguish this case from *Maldonado* and, therefore, dismiss the appeal of Najera's sentence.

**CONCLUSION**

For these reasons, we AFFIRM the district court's decision to deny Najera's suppression motion and DISMISS Najera's appeal of his sentence.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge

---

[3] (...continued)
defendant's claim that DEA agents lacked reasonable suspicion to detain the defendant and the Court's denial of defendant's motion to dismiss. The defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the conviction and sentence imposed. By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate by the court. . . . In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, the court departs upwards from the applicable sentencing guideline range determined by the court.

R. at 199–200. The only difference between this language and the language in *Maldonado* is that Najera retained his right to challenge the suppression issue.